UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,                    Court File No. 19-cr-140 (NEB/LIB)

                Plaintiff,

v.                                                                    **REPORT AND RECOMMENDATION**

Michael Jacob Blandford (1)
Matthew Jon Leigland (2),

                Defendants.

_____

      This matter comes before the undersigned United States Magistrate Judge upon Defendant Michael Jacob Blandford's ("Defendant Blandford") Motion to Suppress Statements with Incorporated Legal Authority, [Docket No. 66], Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure, [Docket No. 67], Defendant Matthew Jon Leigland's ("Defendant Leigland") Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 76], and Defendant Leigland's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 77]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on July 17, 2019, regarding the parties' pretrial motions.[1]

      Following the motions hearing, the parties requested the opportunity to submit supplemental briefing which was completed on August 14, 2019, and Defendant Blandford's Motion to Suppress Statements with Incorporated Legal Authority, [Docket No. 66], Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure, [Docket No. 67], Defendant Leigland's Motion to Suppress Evidence Obtained as a Result of Search and

_____

[1] The Court addressed the parties' pretrial discovery motions by separate order. [Docket No. 89].

Seizure, [Docket No. 76], and Defendant Leigland's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 77], were then taken under advisement by the undersigned on August 15, 2019.

For the reasons discussed herein, the Court recommends that Defendant Blandford's Motion to Suppress Statements with Incorporated Legal Authority, [Docket No. 66], be **GRANTED in part and DENIED in part**, and that Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure, [Docket No. 67], Defendant Leigland's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 76], and Defendant Leigland's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 77], be **DENIED**.

## I. BACKGROUND

Defendants are each charged with one count of possession with intent to distribute methamphetamine, in violation of 18 U.S.C. § 2, 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(B), and 853. (Indictment [Docket No. 27]).

## II. RELEVANT FACTS

On March 18, 2019, Trooper Nicholas Otterson (hereinafter "Trooper Otterson"), with the Minnesota State Patrol for the past 10 years, was facing West in the parking lot of the Motley Fire Department watching traffic pass on Highway 10.[2] (July 17, 2019, Motions Hearing, Digital Recording at 2:24–2:25 p.m.; Gov't Ex 1 at 0:00–0:55). While observing traffic, Trooper Otterson testified that he was relying on his visual assessment to gauge the speed of vehicles. (July 17, 2019,

---

[2] Except where expressly indicated otherwise, the Court's statement of facts is derived from the testimony of Minnesota State Trooper Nicholas Otterson at the July 17, 2019, motions hearing, and from Government's Exhibit 1, which is a dashboard video recording from Trooper Otterson's police vehicle. At the motions hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 1. (July 17, 2019, Motions Hearing, Digital Recording at 2:29–2:30 p.m.).

Motions Hearing, Digital Recording at 2:24–2:26 p.m.). He testified that he had previously been trained on this tactic around eight years ago and passed the training with over 90% accuracy. (Id.; 2:46–2:47 p.m.). Trooper Otterson further testified that during the course of his career, he had observed the speeds of thousands of vehicles and was frequently able to confirm his visual estimation of speeds through the use of radar. (Id.). Trooper Otterson also testified that he had worked in the Motley area, where he observed Defendant Blandford's vehicle, for the past 5 years, and that he monitors that area about half of his time on duty. (Id. at 2:26–2:27 p.m.; 2:41–2:42 p.m.).

At approximately 9:50 a.m., on March 18, 2019, while sitting in the Motley Fire Department parking lot, Trooper Otterson observed Defendant Blandford's vehicle drive past him at what he visually estimated to be a speed exceeding the legal posted limit of 30 miles per hour. (Id. at 2:24–2:25 p.m.). Trooper Otterson also testified that he believed the vehicle braked hard right before it drove past him because he observed the front end of the vehicle dip down. (Id. at 2:27–2:28 p.m.). Trooper Otterson also testified that as the vehicle approached him and drove past him, he observed the exhaust was loud. (Id.).

According to the dashcam of Trooper Otterson's police vehicle, a few seconds after Defendant Blandford drove past him, Trooper Otterson pulled his police vehicle out of the parking lot and turned right to follow behind Defendant Blandford's vehicle. (Gov't Ex. 1 at 1:00–1:10). After Trooper Otterson pulled out of the parking lot, Defendant Blandford's vehicle immediately turned right into a gas station, approximately four blocks away from where Trooper Otterson had been parked. (Id. at 1:10–1:20; July 17, 2019, Motions Hearing, Digital Recording at 2:50–2:51 p.m.).

After Defendant Blandford pulled his vehicle into the gas station, he parked his vehicle next to a gas pump. (Gov't Ex. 1 at 1:25–1:35). As Defendant Blandford parked his vehicle, Trooper Otterson simultaneously pulled his patrol vehicle up to Defendant Blandford's car and parked it so that the front end of his patrol vehicle was perpendicular to the front of Defendant Blandford's vehicle. (Id.).

After parking his patrol vehicle, Trooper Otterson approached the driver's side of Defendant Blandford's vehicle. (Id. at 1:45–1:55). As Trooper Otterson approached, Defendant Blandford rolled down the driver's side window. (Id.). Trooper Otterson testified that as he began talking to Defendant Blandford, he observed that Defendant Blandford had dilated pupils, bloodshot and watery eyes, and sores on his face. (July 17, 2019, Motions Hearing, Digital Recording at 2:31–2:32 p.m.).

Trooper Otterson initiated the conversation by asking Defendants how they were doing, and he asked Defendant Blandford to turn off his vehicle so he could hear him better. (Gov't Ex. 1 at 1:45–1:55). Trooper Otterson then told Defendants that he pulled them over because they were speeding in a 30 miles per hour zone. (Id. at 1:55–2:00). He also asked Defendant Blandford if he knew how fast he was going, and Defendant Blandford said that his speedometer was broken, that he was using an app on his phone to gauge his speed, but that the app was "off." (Id.).

Trooper Otterson then asked Defendant Blandford if he knew that his exhaust was loud and whether he knew if it worked. (Id. at 2:00–2:05). Defendant Blandford acknowledged that the exhaust was loud. (Id. at 2:05–2:10). Trooper Otterson then asked Defendant Blandford if he had his driver's license on him and proof of insurance for the vehicle. (Id. at 2:10–2:20). Defendant Blandford said he did not, but he did have a copy of the title to the car, which was issued in North Dakota. (Id. at 2:35–2:45; July 17, 2019, Motions Hearing, Digital Recording at 2:32–2:33 p.m.).

Trooper Otterson further asked Defendant Blandford if he had anything with his name on it, and Defendant Blandford said that he did not. (Gov't Ex. 1 at 2:35–2:45). Trooper Otterson asked if the name on the title of the car was his, and Defendant Blandford said that it was the name of the prior owner of the vehicle. (Id. at 2:40–2:50).

Trooper Otterson again asked Defendant Blandford if he had any insurance for the vehicle, and Defendant Blandford said that he did not because he had only purchased the vehicle a few days prior. (Id. at 3:00–3:10). Trooper Otterson then asked Defendant Blandford for his name, date of birth, and age; which Trooper Otterson wrote it down. (Id. at 3:10–3:40). Trooper Otterson testified that he observed that there were two butane torch lighters on the center console between the Defendants, as well as, a single razor blade on the dash of the vehicle with some white or grayish residue visible on it. (July 17, 2019, Motions Hearing, Digital Recording at 2:32–2:34 p.m.).

Trooper Otterson then asked Defendant Leigland if he had any identification on him, to which Defendant Leigland replied that he did not have anything with his name on it. (Id. at 3:40–3:55).

Trooper Otterson asked Defendant Blandford to step out of his vehicle and accompany Trooper Otterson to his police vehicle so he could look up his information and issue Defendant Blandford a warning ticket. (Id. at 4:05–4:15). When Defendant Blandford got out of his vehicle, he was wearing sweatpants. (Id.). As Defendant Blandford got out of his vehicle, Trooper Otterson testified that he could see that there was something bulging from Defendant Blandford's right pocket. (July 17, 2019, Motions Hearing, Digital Recording at 2:33–2:34 p.m.).

Once in front of his police vehicle, Trooper Otterson asked Defendant Blandford if he had any weapons on him, and Defendant Blandford said he did not. (Gov't Ex. 1 at 4:20–4:30). Trooper

Otterson then briefly patted Defendant Blandford's left and right pockets, and he asked him what was in his right pocket. (Id. at 4:25–4:35). Defendant Blandford reached in his pocket and said there were keys and coins in his pocket. (Id.). Seeing that there was still something else in Defendant Blandford's right pocket, Trooper Otterson asked Defendant Blandford if he had tissue paper in his pocket, and Defendant Blandford responded that it was a "bag." (Id. at 4:35–4:45). Trooper Otterson then asked Defendant Blandford if it was a bag of marijuana, to which Defendant Blandford responded that it was. (Id.). Trooper Otterson asked Defendant Blandford if he would take the bag out of his pocket and Defendant Blandford did. (Id. at 4:45–4:50). Trooper Otterson asked Defendant Blandford if the bag he produced might actually be filled with cocaine. (Id.).

As Trooper Otterson was asking Defendant Blandford if the bag was filled with cocaine, Defendant Blandford turned and began to run away from where the vehicles were parked. (Id.). Trooper Otterson testified that while Defendant Blandford was running away from him, Defendant Blandford was observed to throw the bag across the gas station parking lot. (July 17, 2019, Motions Hearing, Digital Recording at 2:35–2:36 p.m.). Trooper Otterson ran after Defendant Blandford telling him four times to get down on the ground. (Gov't Ex. 1 at 4:45–5:00).

Trooper Otterson testified that, after he got Defendant Blandford on the ground, he unholstered his pistol, and he pointed it towards Defendant Blandford's vehicle where Defendant Leigland was still sitting in the passenger's seat. (July 17, 2019, Motions Hearing, Digital Recording at 2:35–2:36 p.m.). Trooper Otterson yelled at Defendant Leigland to put his hands up. (Id.). At this point, Trooper Otterson testified that he was attempting to call for back up, but his radio was not working and it just kept 'bonking.' (Id.). Trooper Otterson further testified that he was eventually able to use his radio to call for back up. (Id. at 2:36–2:37). Trooper Otterson then handcuffed Defendant Blandford, and after doing so, Trooper Otterson testified that he again

checked Defendant Blandford's waist for any weapons. (Id.). Trooper Otterson then ordered Defendant Leigland out of the vehicle, and he put him in handcuffs as well. (Id.; Gov't Ex. 1 at 5:55–6:05).

Trooper Otterson patted down Defendant Leigland and found that he had a drug scale in his pocket, as well as, marijuana paraphernalia in his pocket. (Id.). Trooper Otterson advised both Defendants of their Miranda rights, and both Defendants acknowledged that they understood their Miranda rights. (Id.).[3]

Thereafter, a backup unit arrived, and Defendant Leigland was placed in the backup vehicle. (Id.). Trooper Otterson then placed Defendant Blandford in the back of his police vehicle. (Id.).

Afterwards, Trooper Otterson deployed his drug dog around the exterior of Defendant Blandford's vehicle, as well as, the interior of the vehicle. (Id. at 3:04–3:05 p.m.). The drug dog alerted that there were drugs in Defendant Blandford's vehicle. (Id. at 3:05–3:06 p.m.).

Trooper Otterson testified that he then photographed the bag that Defendant Blandford had pulled from his pocket and had thrown across the gas station parking lot before he retrieved it. (Id. at 2:36–2:37 p.m.).

Thereafter, Trooper Otterson had Defendant Blandford's vehicle towed from the gas station.

## III.    DEFENDANT BLANDFORD'S MOTION TO SUPPRESS STATEMENTS WITH INCORPORATED LEGAL AUTHORITY. [DOCKET NO. 66].

Defendant Blandford moves the Court to suppress both his pre-Miranda and post-Miranda statements made to law enforcement at the time of his arrest on March 18, 2019.

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B.  Analysis

Defendant Blandford first asks the Court to suppress his post-Miranda statements made to law enforcement on March 18, 2019.

In its Responsive Memorandum, the Government states that, without conceding any constitutional infirmity, it does not intend to use the post-Miranda statements as part of its case-in-chief. (Gov't Resp., [Docket No. 94], at 5). The Government further states that it therefore does

not object to Defendant Blandford's motion to the extent it seeks suppression of his post-<u>Miranda</u> statements. (<u>Id.</u>).

Accordingly, to the extent that Defendant Blandford seeks to suppress his post-<u>Miranda</u> statements made to law enforcement, the Court recommends Defendant Blandford's Motion to Suppress Statement with Incorporated Legal Authority, [Docket No. 66], be **GRANTED**.

In addition to his post-<u>Miranda</u> statements, Defendant Blandford also moves the Court to suppress his pre-<u>Miranda</u> statements made to Trooper Otterson on the basis that the search and seizure of his vehicle was illegal, and thus, any evidence discovered from the search and seizure of Defendant Blandford's vehicle, including any pre-<u>Miranda</u> statements made to law enforcement, should be suppressed.

The Court will first address whether the search and seizure of Defendant Blandford's vehicle was proper, and thereafter, it will address whether Defendant Blandford's pre-<u>Miranda</u> statements should be suppressed on that basis.

## IV.    DEFENDANT BLANDFORD'S MOTION FOR SUPPRESSION OF EVIDENCE OBTAINED BY SEARCH AND SEIZURE. [DOCKET NO. 67].

Defendant Blandford moves the Court to suppress any evidence obtained as a result of the search and seizure of Defendant Blandford's vehicle. Specifically, Defendant Blandford contends that Trooper Otterson did not have "probable cause" to initiate the traffic stop of his vehicle based on a visual speed assessment alone or based on the excessive sound of his muffler. (Def.'s Mem., [Docket No. 90], at 4). Defendant Blandford also argues that Trooper Otterson improperly conducted a <u>Terry</u> pat-search on him after the stop because Trooper Otterson did not have an articulable suspicion that Defendant Blandford was armed or presently dangerous. (<u>Id.</u> at 7). Lastly, based on his contention that the stop of his vehicle was illegal and that the <u>Terry</u> pat-search

was improper, Defendant Blandford argues that his pre-<u>Miranda</u> statements should be suppressed as constitutionally tainted. (<u>See</u>, Def.'s Mem., [Docket No. 91], at 5).

### A. Standard of Review

In his Memorandum, Defendant Blandford argues that Trooper Otterson needed "probable cause" to initiate the traffic stop of his vehicle. (<u>See</u>, Def.'s Mem., [Docket No. 91], at 4). Defendant Blandford, however, applies the wrong standard. Rather, it is well-established that "[l]aw enforcement officers may make an investigatory stop if they have a <u>reasonable and articulable suspicion</u> of criminal activity." <u>United States v. Hightower</u>, 716 F.3d 1117, 1119 (8th Cir. 2013) (quoting <u>United States v. Bustos–Torres</u>, 396 F.3d 935, 942 (8th Cir. 2005) (emphasis added)). This type of investigatory stop is commonly referred to as a <u>Terry</u> stop. <u>See</u>, <u>Id.</u> (citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)).

Accordingly, the Court will analyze Defendant Blandford's suppression motion under the proper standard of whether there was a reasonable, articulable suspicion to initiate the traffic stop of Defendant Blandford's vehicle.

A <u>Terry</u> stop is justified when there is reasonable suspicion that the individual being stopped is currently engaged in criminal activity or previously committed a crime. <u>United States v. Hughes</u>, 517 F.3d 1013, 1016 (8th Cir. 2008). "A reasonable suspicion is a 'particularized and objective' basis for suspecting [criminal activity by] the person who is stopped." <u>Hightower</u>, 716 F.3d at 1119–120 (alteration in original). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (internal quotations marks omitted). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of

wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause." Navarette v. California, 134 S. Ct. 1683, 1687 (2014).

The inquiry into whether reasonable suspicion exists considers whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21–22. It is an objective standard based on the information known to the officers at the time of the seizure. United States v. Hamilton, 591 F.3d 1017, 1022 (8th Cir. 2010). A reviewing court utilizes a totality of the circumstances analysis to determine whether reasonable suspicion exists. Hughes, 517 F.3d at 1016.

Furthermore, "[a] police officer who has a legitimate contact with another person, and who has reason to believe that person may be armed and dangerous, may conduct a pat-down search to protect officer safety, regardless of whether there is also probable cause to arrest." United States v. Menard, 95 F.3d 9, 10–11 (8th Cir. 1996) (citing Terry, 392 U.S. at 27). "[T]he 'officer need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2008) (quoting Terry, 392 U.S. at 27).

**B.  Analysis**

Defendant Blandford first argues that Trooper Otterson's traffic stop of his vehicle was illegal because it was solely based on Trooper Otterson's visual estimation of Defendant Blandford's vehicle's speed. (Def.'s Mem., [Docket No. 90], at 4–5).

In his memorandum, Defendant Blandford acknowledges that the Eighth Circuit has previously held that reasonable suspicion for a traffic stop can be solely based on a visual estimation of a vehicle's speed. Even so, Defendant Blandford argues that reasonable suspicion

11

for a traffic stop can be based on a visual estimation of a vehicle's speed in only "appropriate circumstances." (Id.). Defendant Blandford primarily relies on the Fourth Circuit case, United States v. Sowards, 690 F.3d 583, 591 (4th Cir. 2012), to support his contention. In Sowards, the Court found that "at a minimum, there must be sufficient indicia of reliability for a court to credit as reasonable an officer's visual estimate of speed." Id.

The Eighth Circuit, however, recently addressed the Fourth Circuit's holding in Sowards in United States v. Gaffney, 789 F.3d 866 (8th Cir. 2015). While the Eighth Circuit did not explicitly adopt the reasoning of the Fourth Circuit's holding in Sowards, the Eighth Circuit held that "the issue is whether the totality of the circumstances at the time of the stops supports the reasonableness of the officer's belief that [the defendant] was speeding at all. Id. at 867 (emphasis in original). In Gaffney, the district court specifically stated that it "did not place a great deal of confidence" in the arresting officer's estimation of the speed of the vehicle. Id. However, the Eighth Circuit found that even so, the district court had found that the arresting officer was familiar with the area, thought the defendant was speeding, and saw the defendant brake immediately after the officer began following him. Id. Thus, the Eighth Circuit held that, based on the totality of the circumstances, "the district court correctly concluded that [the arresting officer's] belief that [the defendant] was speeding was objectively reasonable." Id.

In the present case, based on the totality of the circumstances, the Court similarly finds that Trooper Otterson's belief that Defendant Blandford was speeding was objectively reasonable. First, unlike in Gaffney, nothing in the record raises any doubts about Trooper Otterson's belief that Defendant Blandford was traveling at a "visually high" rate of speed. Rather, the record reflects that Trooper Otterson had been trained in the skill of visually estimating the speed of vehicles accurately, and that he regularly uses his training while working as a state trooper. The

record also reflects that Trooper Otterson had worked in the Motley area for the past 5 years, and he was familiar with the area. (July 17, 2019, Motions Hearing, Digital Recording at 2:24–2:25 p.m.) Lastly, the record also reflects that Trooper Otterson saw Defendant Blandford's vehicle suddenly brake hard as the vehicle neared where Trooper Otterson was parked. (Id. at 2:27–2:28 p.m.).[4]

Therefore, under the totality of the circumstances, the Court finds that Trooper Otterson's belief that Defendant Blandford was speeding was objectively reasonable.

Accordingly, the Court concludes that Trooper Otterson had reasonable suspicion to initiate a traffic stop of Defendant Blandford's vehicle.[5]

Defendant Blandford next contends that there was not articulable suspicion that he was armed or dangerous such that would justify the Terry pat-down search by Trooper Otterson after the traffic stop. (Def.'s Mem., [Docket No. 90], at 7–8.)

If, during a traffic stop, an officer develops a reasonable, articulable suspicion that criminal activity has occurred or is occurring, "he has 'justification for a greater intrusion unrelated to the traffic offense.'" United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (quoting Bloomfield, 40 F.3d at 918); See also, United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003) ("an

---

[4] The Court notes that nothing about the dashcam video contradicts Trooper Otterson's belief that Defendant Blandford was traveling above the speed limit when he passed in front of Trooper Otterson's police vehicle. (See, Gov't Ex. 1).
[5] The Court also notes that, even if the Court did not find that Trooper Otterson's belief that Defendant Blandford was speeding to be objectively reasonably, the Court would still find that Trooper Otterson had reasonable suspicion to initiate a traffic stop of Defendant Blandford's vehicle. Notably, Trooper Otterson testified that when Defendant Blandford drove past him, he could hear the loud exhaust on the vehicle and believed it to be too loud, in violation of Minnesota Statute § 169.69. Defendant Blandford argues that a "close listen . . . reveals that the exhaust system is neither popping or cracking and the noise is neither excessive nor unusual, it is the sounds of a 30+ year old car." (Def.'s Mem., [Docket No. 90], at 7). Despite Defendant Blandford's argument, the issue is only whether Trooper Otterson could reasonably believe that the noise of the vehicle's exhaust violated Minnesota Statute § 169.69. Given that Defendant Blandford acknowledged that the exhaust was loud when asked about it by Trooper Otterson, and given that in his memorandum Defendant Blandford appears to acknowledge the exhaust was loud (just not loud enough to warrant it violating Minnesota Statute § 169.69), the Court finds that, in addition to initiating a traffic stop for driving over the speed limit, Trooper Otterson also had a reasonable basis to initiate a traffic stop of Defendant Blandford's vehicle for violating Minnesota Statute § 169.69.

13

investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop.") "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" Sanchez, 417 F.3d at 975 (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)). "[T]he proper scope of an investigative detention depends upon the purposes of the stop and requires using the least intrusive means reasonably available to achieve those purposes." United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986), cert. denied, 479 U.S. 861, 107 S.Ct. 210, 93 L.Ed.2d 140 (1986) (citing United States v. Jones, 759 F.2d 633, 642 (8th Cir. 1985)).

Here, the present record establishes that Trooper Otterson's pat-down search of Defendant Blandford was justified by reasonable, articulable suspicion.

When Trooper Otterson asked Defendant Blandford if he had his driver's license and insurance information with him, Defendant Blandford indicated that he did not. Furthermore, Defendant Blandford told Trooper Otterson that he did not have anything with him that could potentially verify his identity. Additionally, when asked about the vehicle's proof of insurance, Defendant Blandford stated that he did not have proof of insurance for the vehicle, but instead, he only gave Trooper Otterson a copy of the title of the vehicle. When Trooper Otterson asked if Defendant Blandford's name was the same as the name on the title of the vehicle, Defendant Blandford stated that it was not. Accordingly, because Defendant Blandford allegedly did not have anything with his name on it, Trooper Otterson was justified in prolonging the traffic stop in order to determine if Defendant Blandford had committed the crime of providing a false name to a police officer. See, United States v. Cloud, 594 F.3d 1042, 1045 (8th Cir. 2010) ("a lawful detention may

be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification.").

In addition, in conducting an investigation into the Defendant Blandford's identity, Trooper Otterson was also permitted to ask Defendant Blandford to exit the vehicle. "Officers who have conducted a lawful <u>Terry</u> stop of a vehicle may order the driver to exit the vehicle pending completion of the stop." <u>United States v. Spotts</u>, 275 F.3d 714, 719 n. 2 (8th Cir. 2002). Not only was Trooper Otterson justified in ordering Defendant Blandford to exit the vehicle pursuant to a valid traffic stop, it was also necessary in order to conduct an accurate assessment of Defendant Blandford's identity. <u>See</u>, <u>United States v. Stoltz</u>, No. 11-cr-96 (RHK/LIB), 2011 WL 2533872, at *9 (D. Minn. June 3, 2011), report and recommendation adopted, No. 11-cr-96 (RHK/LIB), 2011 WL 2533919 (D. Minn. June 27, 2011), aff'd, 683 F.3d 934 (8th Cir. 2012).

The Court also finds that Trooper Otterson was permitted to conduct a <u>Terry</u> pat-down search of Defendant Blandford upon his exiting from the vehicle. "After stopping a suspect, officers may take such 'additional steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" <u>United States v. Thomas</u>, 249 F.3d 725, 729 (8th Cir. 2001) (quoting <u>Doffin</u>, 791 F.2d at 120).

As previously discussed in the facts above, Trooper Otterson observed two butane torch lighters and a razorblade with visible residue on it in Defendant Blandford's vehicle. Based on his experience in law enforcement, Trooper Otterson believed that butane torch lighters and razorblades were items consistent with the use of drugs. <u>See</u>, <u>United States v. Simpson</u>, 2009 WL 499470, at *2 (D. Utah Feb. 27, 2009), aff'd, 609 F.3d 1140 (10th Cir. 2010) (finding that the defendant's possession of a butane torch lighter could support the arresting officer's reasonable suspicion that the defendant was involved in the illegal use and transport of drugs); <u>See also</u>,

United States v. Guerrero, 472 F.3d 784, 797 (10th Cir. 2007) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)) ("[O]fficers are allowed 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'").

"Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction." Bustos-Torres, 396 F.3d at 944 (citing United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997). This holding has been repeatedly adopted by the Eighth Circuit. See, Gaffney, 789 F.3d at 870; United States v. Crippen, 627 F.3d 1056, 1063 (8th Cir. 2010); United States v. Stigler, 574 F.3d 1008, 1010 (8th Cir. 2009) (noting the defendant's "actions created a reasonable suspicion that he was involved in drug trafficking, which on its own justified the protective pat-down.").

Thus, because Trooper Otterson had a reasonable suspicion that Defendant Blandford was involved with the use of drugs, Trooper Otterson's Terry pat-down for safety was permitted under the circumstances. See, United States v. Navarrete–Barron, 192 F.3d 786, 790–91 (8th Cir. 1999) (providing that during a Terry stop officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop, including handcuffing defendants as a precaution).[6]

---

[6] Defendant Blandford also appears to make a passing argument that Trooper Otterson exceeded the limits of the Terry pat-down by asking Defendant Blandford to remove the item he could see bulging from his right pocket. (Def.'s Mem., [Docket No. 90], at 8). Contrary to Defendant Blandford's passing argument, Courts have consistently allowed officers to "ask the detainee questions in order to dispel or confirm his suspicions, but questioning is limited in scope to the circumstances that justified the stop." United States v. McGauley, 786 F.2d 888, 890–91 (8th Cir. 1986); Berkemer v. McCarty, 468 U.S. 420, 439–40 (1984) ("The [Terry] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detained a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"). Asking questions related to the reasonable suspicion and seeking consent to search the vehicle are minimally intrusive and "reasonable and permissible methods of continuing the investigation that [do] not unduly prolong a detention."

Accordingly, the Court recommends that Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure, [Docket No. 67], be **DENIED**.

Additionally, as previously discussed, Defendant Blandford argues that his pre-Miranda statements should be suppressed because they were tainted by the improper initial stop of his vehicle and the Terry pat-down search. (See, Def.'s Mem., [Docket No. 91], at 5). Because the Court has found that the stop of Defendant Blandford's vehicle and the Terry pat-down were both proper, the Court recommends that to the extent Defendant Blandford seeks suppression of his pre-Miranda statements, Defendant Blandford's Motion to Suppress Statements with Incorporated Legal Authority, [Docket No. 66], also be **DENIED**.

## V.    DEFENDANT LEIGLAND'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 76].

Defendant Leigland moves the Court to suppress all evidence obtained as a result of the search and seizure resulting from a pat-down search on March 18, 2019. Specifically, Defendant Leigland argues that he was arrested without probable cause because "[h]e was simply a passenger in a car that was pulled over for a traffic violation." (Def.'s Mem., [Docket No. 88], at 2). Thus, Defendant Leigland contends that because his arrest was illegal, the paraphernalia and drug scale discovered in his pockets during the pat-down search of his person incident to his arrest should be suppressed. (Id. at 2–3).

### A.  Standard of Review

The Fourth Amendment of the United States Constitution guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

Gill, 513 F.3d at 845. As previously discussed, at the time of the pat-down search, Trooper Otterson reasonably suspected that Defendant Blandford either possessed or was using drugs. Accordingly, Trooper Otterson's questions after the pat-down were reasonably related to the limited expanded scope of the Terry stop. Thus, Trooper Otterson did not exceed the limits of the Terry pat-down by asking Defendant Blandford minimally intrusive but related follow up questions.

seizures." "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). Nevertheless, "[i]t is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." United States v. Robinson, 414 U.S. 218, 224 (1973).

Furthermore, a warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." United States v. Torres–Lona, 491 F.3d 750, 755 (8th Cir. 2007). "A 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity' is sufficient." United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008) (quoting Torres–Lona, 491 F.3d at 755).

In considering whether probable cause existed to arrest a defendant, the Court "examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks omitted).

## B. Analysis

In the present case, the Court finds that there was probable cause to warrantlessly arrest Defendant Leigland on March 18, 2019.

After Trooper Otterson caught up to and handcuffed Defendant Blandford, with his weapon drawn, Trooper Otterson approached the passenger's seat of Defendant Blandford's vehicle where

18

Defendant Leigland was sitting, and Trooper Otterson ordered him to get out. Once Defendant Leigland was out of the vehicle, Trooper Otterson handcuffed him, and he immediately searched Defendant Leigland's pockets. Gov't Ex. 1 at 5:55–6:15). Accordingly, the Court finds that Defendant Leigland was at this time under arrest for the purposes of the Fourth Amendment.

Since Defendant Leigland was under arrest before the drug scale and paraphernalia were found on his person, the question is whether "the events leading up to the arrest 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting Orneleas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

The Supreme Court has repeatedly instructed that "the belief of guilt must be particularized with respect to the person to be searched or seized," See, Pringle, 540 U.S. at 371 (quoting Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)), such that:

> [A] person's mere propinquity to others independently suspected of criminal activity does not give rise to probable cause to search that person. Sibron v. New York, 392 U.S. 40, 62–63 (1968). Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

Id. at 372–73 (quoting Ybarra, 444 U.S. at 91). However, "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity." United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983).

In Maryland v. Pringle, 540 U.S. 366 (2003), for example, the defendant was one of three passengers in a vehicle stopped by law enforcement for speeding. 540 U.S. at 367. During a search of the car, a police officer found $763.00 in the glove compartment and five baggies of cocaine in the backseat armrest. Id. at 368. The United States Supreme Court found it "reasonable for the

officer to infer a common enterprise among the three" occupants because all three passengers denied ownership of the drugs, there was no other singling out of a guilty party, and the drugs were located in a place accessible to all of the occupants. Id. at 373.

Likewise, in United States v. Leonard, No. 06-cr-163 (PJS/RLE), 2006 WL 2974234, at *2 (D. Minn. Oct. 16, 2006), the Court found that there was probable cause to arrest the defendant who was a passenger in a vehicle where drugs were found hidden in the vehicle's door panel and where neither of the defendants claimed ownership of the drugs. The Court held that "law enforcement had probable cause to believe that the Defendant, as a passenger, was engaged in a common enterprise with the driver in drug trafficking." Id. at *7.

Based upon the totality of facts here known to Trooper Otterson at the time, there was a reasonable basis for Trooper Otterson to believe that Defendant Leigland was involved in a common enterprise of illegal drug use or possession because Defendant Leigland claimed to have no form of identification, he had been riding as a passenger in a vehicle where the driver was in possession of illegal drugs and who had tried to evade law enforcement, and there were visible and accessible to both Defendants in the car two butane lighters (which as previously noted above are often associated with illegal drug possession or use) and a razorblade with potential drug residue visible on it.

Therefore, the Court finds that there was a sufficient indicia of illegal drug activity such that Defendant Leigland's arrest, and the search incident to that arrest, was valid. Wyoming v. Houghton, 526 U.S. 295, 304–05 (1999) ("[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing."); See also, United States v. Leonard, No. 06-cr-163 (PJS/RLE), 2006 WL 2974234, at *2 (D. Minn. Oct. 16, 2006) ("it was eminently reasonable for [the] officers to infer a

common enterprise between [the defendants] to aid and abet each other in the possession of controlled substances").

Accordingly, the Court recommends that Defendant Leigland's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 76], be **DENIED**.

## VI. DEFENDANT LEIGLAND'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS. [DOCKET NO. 77].

Defendant Leigland moves the Court to suppress his statements made to law enforcement on March 18, 2019, while in custody solely on the basis that his statements were tainted by and were "the result of his illegal arrest and as derivative fruit of that illegal arrest." (Def.'s Mem., [Docket No. 88], at 3).

As discussed above, however, the Court concludes that Defendant Leigland's arrest was supported by probable cause. Accordingly, the Court recommends that Defendant Leigland's Motion to Suppress Statements, Admissions, and Answer, [Docket No. 77], be **DENIED**.

## VII. CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Blandford's Motion to Suppress Statements with Incorporated Legal Authority, [Docket No. 66], be **GRANTED in part** as to his post-Miranda statements and **DENIED in part** as to his pre-Miranda statements, as set forth above;

2. Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure, [Docket No. 67], be **DENIED**;

3. Defendant Leigland's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 76], be **DENIED**; and

4.   Defendant Leigland's Motion to Suppress Statements, Admissions, and Answers, [Docket

No. 77], be **DENIED**.


Dated: September 16, 2019                                    s/Leo I. Brisbois
                                                            Leo I. Brisbois
                                                            U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.