# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-CR-140 (NEB/LIB) |
| Plaintiff, | |
| v. | ORDER ACCEPTING REPORT AND RECOMMENDATION |
| MICHAEL JACOB BLANDFORD (1), MATTHEW JON LEIGLAND (2), | |
| Defendants. | |

This matter is before the Court on the defendants' objections to the September 16, 2019 Report and Recommendation ("R&R") of United States Magistrate Judge Leo I. Brisbois.[1] [ECF No. 99.] Judge Brisbois recommends (1) granting in part and denying in part denying Defendant Blandford's Motion to Suppress Statements with Incorporated Legal Authority [ECF No. 66]; (2) denying Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure [ECF No. 67]; (3) denying Defendant Leigland's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 76]; and (4) denying Defendant Leigland's Motion to Suppress Statements, Admissions, and Answers [ECF No. 77]. The Court has conducted a *de novo* review. *See*

---

[1] The time between the R&R and this Court's Order is due to Defendant Leigland's fugitive status. *See* ECF Nos. 117 (granting Leigland's motion to suspend period for filing objections to the R&R on based on his fugitive status), 125 (returning bench warrant for Leigland executed on November 8, 2019), 124 (setting deadline for Leigland's objections to the R&R for December 2, 2019).

28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); D. Minn. L.R. 72.2. Based on that review, the Court overrules the defendants' objections and accepts the R&R.

## ANALYSIS

The undisputed facts[2] are clearly set forth in the R&R and are incorporated by reference. The defendants argue that physical evidence and their statements should be suppressed for various reasons. The Court will address each of their arguments in turn.

**I.    Blandford's Objections**

Defendant Blandford's suppression argument is threefold: (1) his Fourth Amendment rights were violated when Trooper Nicholas Otterson ("Trooper Otterson" or "Otterson") stopped his vehicle; (2) Trooper Otterson conducted an improper and illegal search of Blandford; and (3) Blandford's pre-*Miranda* statements should be suppressed.

*A.    The Traffic Stop*

Trooper Otterson testified that he pulled over Blandford's car because: (1) he observed the car speeding; and (2) as the car passed by him, he could hear loud exhaust. [ECF No. 132 ("Hr'g Trans.") at 39.] Magistrate Judge Brisbois found that there was a factual and legal basis for the traffic stop, *i.e.*, that it was objectively reasonable for

---

[2] The Government and the defendants do not dispute the facts set forth in the R&R, except for an issue Defendant Blandford raises relating to Trooper Otterson's credibility. The Court addresses that issue below.

2

Trooper Otterson to stop the vehicle based on his visual estimation of its speed. (R&R at 12–13.) Blandford argues that the stop was not reasonable.

Officers need "reasonable suspicion" to justify a traffic stop. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Reasonable suspicion exists when an officer has a "particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (citation and quotation marks omitted). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (citations and quotation marks omitted). In determining whether an officer had a particularized and objective basis for suspecting legal wrongdoing, a reviewing court "must look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008).

Trooper Otterson testified about his eight years of experience visually estimating vehicle speed, as well as his five years of experience working in the physical location of this traffic stop. (*See, e.g.*, Hr'g Trans. at 38–39.) He testified that he saw Blandford's car "suddenly brake[] hard . . . because the front of the vehicle's nose dipped down." (*Id.* at

3

39; *see* Gov't Ex. 1 at 1:00–1:14 (squad video in which Otterson notes, "visually fast in a 30 zone, brakes on when he passed me").) Like the Magistrate Judge, this Court finds Otterson's belief that Blandford was speeding to be objectively reasonable.

Blandford argues that the Magistrate Judge erred by finding that nothing in the record raises doubt about Trooper Otterson's determination that Blandford was speeding. He questions Otterson's credibility, contending that Otterson exaggerated and overstated evidence. This evidence includes: (1) Otterson's purported testimony that Blandford "'immediately' pulled into a gas station after passing the squad car," when the station was four blocks away, [ECF No. 116 ("Blandford's Br.")] at 3]; (2) Otterson's testimony that Blandford moved his body in such a way as to prevent a pat search of his pockets, when the squad video allegedly shows him moving closer to Otterson "to facilitate the pat search," (*id.*); and (3) Otterson's "lie" to another officer during the stop that he had recovered two pounds of a suspected controlled substance from Blandford's car, when it was approximately one pound, (*id.*). Blandford maintains that Otterson's alleged inclination to exaggerate should raise concerns about his observation of Blandford's speeding. The Court disagrees.

First, Trooper Otterson testified that after Blandford's vehicle had passed him, he pulled out onto the road, "then [] narrated to [his] squad video that the vehicle had been speeding," and that "now the vehicle was then immediately turning off into a gas station after [he] pulled out." (Hr'g Trans. at 40.) The squad video supports Otterson's testimony

4

and demonstrates that the time between Otterson pulling onto the road and Blandford turning into the station was less than fifteen seconds. (Gov't Ex. 1 at 1:00–1:14.) Second, the squad video does not support Blandford's assertion that he moved closer to Otterson to facilitate the pat-down search. (*Id.* at 4:24–4:47.) Finally, the Court finds that Otterson's mistake about the weight of the recovered controlled substance does not undermine his credibility as to his reasonable belief that Blandford was speeding. Otterson testified that he "thought it was maybe closer to two pounds [of a controlled substance] when [he] first looked at it," but it only weighed approximately one pound. (Hr'g Trans. at 79.) Otterson did not testify to his experience visually determining the weight of suspected controlled substances. In contrast, the record reflects his years of experience visually estimating vehicle speed. The Court is not persuaded that Otterson's ability to visually estimate the weight of a controlled substance affects his ability to visually estimate vehicle speed.

Blandford also takes issue with the Magistrate Judge's note that he would find the stop reasonable because Otterson had a reasonable basis to initiate the stop of the vehicle for violating Minnesota Statute § 169.69. (R&R at 13 n.5.) Under Minnesota law, every vehicle must be equipped "with a muffler in good working order which blends the exhaust noise into the overall vehicle noise." Minn. Stat. § 169.69. A violation of § 169.69 is a petty misdemeanor. *See State v. Beardemphl*, 674 N.W.2d 430, 432 (Minn. Ct. App. 2004) (citing Minn. Stat. § 169.89, subd. 1). The Eighth Circuit has upheld findings of reasonable suspicion for violations of misdemeanors and petty misdemeanors that would not

5

authorize a custodial arrest. *See, e.g., United States v. Goodwin-Bey*, 718 F. App'x 447, 448 (8th Cir. 2018) (citing *United States v. Givens*, 763 F.3d 987, 990 (8th Cir. 2014) (stating "[i]t is not uncommon for officers to stop vehicles due to the lack of an apparent temporary registration tag, and such stops are generally upheld as supported by reasonable suspicion"), and *United States v. Banks*, 553 F.3d 1101, 1104 (8th Cir. 2009) (stating "the officers actually witnessed [the defendant] riding a bicycle without a light [a petty misdemeanor offense], which is more than sufficient to establish reasonable, articulable suspicion of criminal activity" (alterations in original))).

Otterson testified that as Blandford's car drove past, he could hear the loud exhaust on the car and believed it to be too loud, in violation of Minnesota law. (Hr'g Trans. at 39–40, 43.) The squad video shows Otterson asking Blandford to shut off the car so that Otterson can hear the defendants. Otterson also informed the defendants that he stopped the car for speeding and because its exhaust was "really loud," which Blandford acknowledged. (Gov't Ex. 1 at 1:46–2:01.) And so, the Court is not persuaded by Blandford's argument that the exhaust could not have been overly loud because the conversation is easily heard on the squad video. Rather, the video shows that the conversation is easily heard because the car is off. The Court finds that the evidence demonstrates that Otterson had a reasonable and articulable suspicion to stop the vehicle for a violation of § 169.69. The Court therefore overrules Blandford's objection based on the reasonableness of the stop.

B.     *The Search*

Blandford maintains that Trooper Otterson's *Terry* frisk was illegal. *See Terry v. Ohio*, 392 U.S. 1, 30–31 (1968) (holding that an officer is entitled to conduct a limited search of a person's outer clothing for weapons where the officer has reasonable grounds to believe that the person is armed and dangerous). "A pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Gaffney*, 789 F.3d 866, 870 (8th Cir. 2015) (citation omitted). Reviewing courts are to make reasonable-suspicion determinations by considering the "'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information." *Id*. Blandford acknowledges that it is reasonable for an officer to believe that a person is armed and dangerous when he is suspected of involvement in a drug transaction. (Blandford's Br. at 6 (citing *United States v. Bustos-Torres*, 396 F.3d 935, 944 (8th Cir. 2005)).) He also concedes that an officer may seize contraband detected during a pat-down search for weapons so long as the search stays "within the bounds marked by *Terry*." (*Id*. at 7 (citing *United States v. Hanlon*, 401 F.3d 926, 930 (8th Cir. 2005)).) He contends that the Magistrate Judge erred in finding that Otterson reasonably believed Blandford was armed and dangerous.

Trooper Otterson testified that the traffic stop took place in a "known drug corridor." (Hr'g Trans. at 50–51.) During the stop, Otterson said that he saw butane torch lighters and a razor blade "for cutting up drugs" in plain view in the car. (Gov't Ex. 1 at 2:19–2:23.) In Otterson's experience, the torch lighters are commonly used "for heating drugs and smoking drugs at high heat." (Hr'g Trans. at 44.) Otterson also testified that he saw on the dash "a single razor blade with some sort of white, grayish residue on it" which was "suspicious to [him] because people often use razor blades to cut up drugs or powder into small, cut-up chunks of it, and use it to prepare it to be able to ingest it." (*Id*.) After the defendants indicated that they were not carrying any forms of identification or proof of insurance, Otterson asked Blandford to exit the car. Otterson testified that he noticed Blandford showed signs of possible drug impairment, and that when he got out of the car, his "eyes [were] darting around, he's on the balls of his feet and he had immediately reached for where that contraband was." (*Id*. at 43, 63.) Otterson asked Blandford if he had any weapons on him and began to pat him for weapons. (Gov't Ex. 1 at 4:23–4:26; Hr'g Trans. at 65.) The Magistrate Judge found, correctly, that Otterson had a reasonable suspicion that Blandford was involved in the use of drugs, and the pat-down for safety was therefore permitted. (R&R at 16.)

Nevertheless, Blandford argues for suppression, contending that contraband must be suppressed when an officer seizes it after concluding that no weapons are present. (Blandford Br. at 7 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993).) "[O]fficers may

lawfully seize contraband they incidentally discover in 'plain touch' during a *Terry* frisk." *Bustos-Torres*, 396 F.3d at 944. In order to seize such contraband, "the officer conducting a pat-down search [must] have probable cause to believe the item in plain touch is incriminating evidence." *Id.* "To give rise to probable cause, the incriminating character of the object must be immediately identifiable." *Id*. at 945; *see United States v. Cowan*, 674 F.3d 947, 953 (8th Cir. 2012) ("A police officer lawfully patting down a suspect's outer clothing may seize any object whose contour or mass makes its identity immediately apparent as incriminating evidence.") (quotation marks and brackets omitted). "[A]n item's incriminatory nature is immediately apparent if the officer at that moment had 'probable cause to associate the property with criminal activity' . . . meaning 'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime.'" *Cowan*, 674 F.3d at 953 (quoting *Texas v. Brown*, 460 U.S. 730, 741–42 (1983)). Probable cause requires only a "practical, nontechnical probability that incriminating evidence is involved." *Id.* (citation and quotation marks omitted).

Trooper Otterson testified that upon patting down Blandford, he "believed that [Blandford] had a bag of drugs that [he] felt by plain feel in [Blandford's] pocket." (Hr'g Trans. at 67.) Before Blandford removed the contraband from his pocket, Trooper Otterson asked him if it was a bag of marijuana. (Gov't Ex. 1 at 4:40–4:44; *see also* Hr'g Trans. at 66 (testifying that he "thought it was a bag of drugs in his pocket;" he "did not

9

think the bag of drugs was a weapon.").) The Court finds that the evidence of Blandford's involvement in drug use—including the torch lighters and razor blade in plain view, and the signs of Blandford's drug impairment—supports Otterson's belief that the bag in Blandford's pocket contained contraband. Moreover, the squad video demonstrates that the likelihood of it being contraband was immediately apparent to Otterson. Otterson had probable cause to associate the bag in Blandford's pocket with criminal activity. Blandford's objection is therefore overruled.

C.     *Blandford's Pre-***Miranda** *Statements*

Blandford seeks to suppress statements he made while in custody before and after Trooper Otterson informed him of his *Miranda* rights.[3] Blandford argues that, regardless of the legality of the traffic stop, he was in custody when he answered Trooper Otterson's questions, and therefore his statements during the encounter should be suppressed. This issue turns, of course, on whether the interrogation was custodial. "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). If a person's "freedom of action is curtailed to a 'degree associated with formal arrest', then he is in custody." *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995) (quoting *Berkemer v. McCarty*,

---

[3] The Government states that it does not intend to use Blandford's post-*Miranda* statements as part of its case-in-chief, and thus, did not object to his motion to suppress the post-*Miranda* statements. [ECF No. 118 at 2 n.1.] No party objects to the portion of the R&R that grants Blandford's motion to suppress his post-*Miranda* statements.

468 U.S. 420, 440 (1984)); *see United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990) (considering a suspect's "freedom to leave the scene, and the purpose, place and length of the interrogation" when determining whether the suspect is in custody).

Before Judge Brisbois, Blandford contended that he was in custody when Otterson told him to exit the car. The Eighth Circuit rejected a similar argument in *United States v. Pelayo-Ruelas*, 345 F.3d 589 (8th Cir. 2003). There, a DEA agent approached the defendant in his vehicle; the defendant produced his driver's license and admitted that he was an illegal alien. *Id*. at 591. The agent asked the defendant to step out of the vehicle, conducted a pat-down search for weapons, and continued questioning the defendant regarding his presence in Minnesota. *Id*. The agent observed tools in the vehicle that, in the agent's experience, were often used to extract drugs from hidden compartments in vehicles. *Id*. The defendant consented to a search of the vehicle and a drug detection dog alerted to the vehicle's rear bumper. *Id*. The agent then arrested the defendant and informed him of his *Miranda* rights. *Id*. The defendant sought to suppress his statements from the time he was removed from the vehicle until his arrest, arguing that he was in custody once the agent removed him from the vehicle and conducted a pat-down search because a reasonable person in those circumstances would not have felt free to leave. *Id*. at 591. The Eighth Circuit affirmed the district court's denial of the motion to suppress, explaining "[o]ne is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger

the detainee's *Miranda* rights." *Id*. at 592. The court held that until the consensual search of the vehicle produced probable cause to believe the defendant was engaged in illegal drug trafficking, the agent's "conduct of the *Terry* stop did not curtail [the defendant's] freedom to the degree associated with a formal arrest." *Id*. at 593.

The Court concludes that prior to the point Blandford threw his drugs and ran, Blandford was not subjected to constraints comparable to a formal arrest. While Blandford claims that Otterson intended to restrain Blandford's movement because he chased Blandford when he tried to leave, an officer's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. Blandford's vehicle was stopped at a gas station, "a location visible to passing motorists." *Id*. "Only a short period of time elapsed between the stop and the arrest" and "[a]t no point during that interval was [Blandford] informed that his detention would not be temporary." *Id.* at 441–42. Rather, when Blandford initially exited the car, Otterson told him that he was going to give Blandford a warning and get him on his way. (Gov't Ex. 1 at 4:08–4:13.) As described above, Otterson patted down Blandford for weapons, and asked Blandford to remove what Otterson believed to be contraband from his pocket. When Blandford pulled the bag of contraband out of his pocket, Otterson asked, "what is that, a big bag of coke?" (*Id*. at 4:46–4:51.) Blandford turned and ran, throwing the bag away. (*Id*.) Otterson caught Blandford, told him to get

on the ground and lay on his stomach, and handcuffed him. (*Id*. at 4:51–5:12; Hr'g Trans. at 46.) It was at this point that Blandford's freedom of action was curtailed to the degree associated with a formal arrest. *See Berkemer*, 468 U.S. at 442 (holding respondent was not taken into custody for the purposes of *Miranda* until the officer arrested him); *Pelayo-Ruelas*, 345 F.3d at 593 (same). The Court concludes that Blandford's pre-*Miranda* statements do not require suppression, and therefore overrules Blandford's objection.

## II. Leigland's Objections

Defendant Leigland argues that physical evidence and his statements should be suppressed because there was no probable cause to arrest him; he asserts he was a "mere passenger" in a vehicle pulled over for a traffic violation. "A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013). To determine whether an officer had probable cause to arrest an individual, courts are to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id*. at 1066 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Arresting officers need "the mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity" for probable cause to justify a warrantless arrest. *Id*. at 1067 (citation and quotation marks omitted). "[T]he belief of

13

guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371.

Leigland claims that Trooper Otterson had no evidence that the defendants were involved in any joint activity or possessed any quantity of drugs sufficient to reasonably infer that they were jointly involved in drug dealing. The Court disagrees. "[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id*. at 373 (citation omitted). As discussed above, Otterson testified that he saw in plain view the butane torch lighters on the center seat, and the razor blade on the dash, which would have been visible and accessible to both Blandford and Leigland. Neither defendant offered proof of identification. When Blandford attempted to run and throw away the bag of controlled substance that had been in his pocket, Otterson stopped and handcuffed Blandford, then ordered Leigland out of the car and handcuffed him. (Gov't Ex. 1 at 5:50–6:15.) Otterson then asked Leigland if he had any weapons on him, patted him down, and removed a drug scale and marijuana rolling papers from Leigland's pocket. (*See id*. at 6:40–6:49; Hr'g Trans. at 47, 85.) Otterson told Blandford he was under arrest, and told Leigland, "you are under arrest, too; you got a scale on you." (Gov't Ex. 1 at 7:17–7:20.) Otterson then read Blandford and Leigland their *Miranda* rights.

Based on the facts leading up to Leigland's arrest, Judge Brisbois correctly found that it was reasonable for Otterson to infer a common enterprise of illegal drug activity

14

among the defendants. The butane torch lighters and razor blade, Blandford's attempt to throw away the contraband and flee the stop, and Leigland's possession of a drug scale and marijuana papers "indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." *Pringle*, 540 U.S. at 373.

Moreover, the record indicates that Otterson initially handcuffed Leigland for safety reasons, not under a criminal enterprise theory. To use handcuffs during a *Terry* stop, "the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (citation and quotation marks omitted). The Eighth Circuit has "repeatedly held that police officers may reasonably handcuff a suspect . . . during the course of a *Terry* stop in order to protect their safety and maintain the status quo." *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011); *see United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016) ("[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety."). In reviewing the reasonableness of handcuffing a suspect, the issue is "whether the officer had an objectively reasonable concern for officer safety or suspicion of danger." *Smith*, 645 F.3d at 1002–03.

As the only officer at the stop, Trooper Otterson was outnumbered by suspects two to one. After Blandford attempted to flee, Otterson initially had trouble calling for backup. (*See* Hr'g Trans. at 46 ("I was trying to call for backup and my radio wasn't working correctly.").) Otterson testified that he "didn't know if Mr. Leigland was going to -- my biggest fear was that he would get out with a weapon and try to harm me, so I was just trying to keep them both under control." (*Id.*) The Court finds that it was reasonable for Otterson to handcuff Leigland briefly based on an objectively reasonable concern for his safety. *See United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992) (concluding that cuffing of suspects during *Terry* stop was reasonable where suspects outnumbered officers and officers were concerned for safety); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) ("In light of the dangerous nature of the suspected crime of drug trafficking and the good possibility that the driver or passenger had a weapon, the defendant's confinement with handcuffs . . . was reasonably necessary to maintain the status quo [and] protect the officers."). Leigland was not handcuffed longer than necessary prior to his arrest because, for the reasons below, probable cause for his arrest was established quickly after his pat-down. *See Navarrete-Barron*, 192 F.3d at 791 (finding that detention did not last for an unreasonably long time because probable cause to arrest defendant was established shortly after he was detained).

After Otterson handcuffed Leigland, he could conduct a pat-down search. *See, e.g.*, *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010) (finding pat-down search

after handcuffing the suspect "was reasonably designed to discover concealed weapons"). After handcuffing Leigland, Otterson asked him if he had any weapons and patted him down. "Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction." *Bustos-Torres*, 396 F.3d at 943. The totality of the circumstances—including the location of the stop in a known drug corridor, the butane torch lighters and razor blade in plain view, the defendants' lack of proof of identification, and Blandford's escalation of the stop when he attempted to flee and throw away contraband—support Otterson's reasonable suspicion that Leigland was involved with drugs and thus carrying weapons. The Court therefore finds that Otterson's pat-down of Leigland was reasonable.

Upon patting down Leigland, Otterson felt his pockets and removed a drug scale and marijuana rolling papers from them. (Hr'g Trans. at 85.) Just as with Blandford, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Dickerson*, 508 U.S. at 375. To lawfully seize items discovered in plain touch during a *Terry* frisk, the officer must have "probable cause to believe the item in plain touch is incriminating evidence." *Bustos-Torres*, 396 F.3d at 944. An item's incriminatory nature is "immediately apparent" if "the facts available to the officer would warrant a man of

reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime." *Cowan*, 674 F.3d at 953. The record indicates that Otterson immediately recognized Leigland's scale as an item useful in a crime, as Otterson told Leigland, "you are under arrest, too; you got a scale on you." (Gov't Ex. 1 at 7:17–7:20.) There is no evidence that Otterson manipulated the objects in Leigland's pockets before making this determination. *See United States v. Stoltz*, No. 11-CR-096 (RHK/LIB), 2011 WL 2533872, at *9 (D. Minn. June 3, 2011), *R&R adopted*, No. 11-CR-96 (RHK/LIB), 2011 WL 2533919 (D. Minn. June 27, 2011), *aff'd*, 683 F.3d 934 (8th Cir. 2012) (finding officer was permitted to seize digital scale from defendant's pocket where officer "immediately recognized [it as] a digital scale of the kind that is commonly used in narcotics transactions" and there was no evidence the item was subject to manipulation).

The Court finds that the events leading up to Leigland's arrest, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *See Winarske*, 715 F.3d at 1066–67 (affording officers substantial latitude in interpreting and drawing inferences from factual circumstances in finding probable cause to arrest an individual). Because Leigland's arrest was supported by probable cause, his statements to law enforcement while in custody, along with the evidence gathered, were not the fruit of an illegal arrest. For these reasons, Leigland's objections to the R&R are overruled.

The parties do not object to any other aspect of the R&R. The Court determines whether the recommendations are clearly erroneous or contrary to law when no objection

has been made. See Fed. R. Crim. P. 59; *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (per curiam). Having reviewed those portions of the R&R to which the parties have not objected, the Court finds no clear error.

## CONCLUSION

Based on all the files, records, and proceedings herein, the Court OVERRULES the defendants' objections [ECF Nos. 116, 133] and ACCEPTS the R&R [ECF No. 99]. Accordingly, IT IS HEREBY ORDERED THAT:

1. Defendant Blandford's Motion to Suppress Statements with Incorporated Legal Authority [ECF No. 66] is GRANTED IN PART as to his post-*Miranda* statements and DENIED IN PART as to his pre-*Miranda* statements;

2. Defendant Blandford's Motion for Suppression of Evidence Obtained by Search and Seizure [ECF No. 67] is DENIED;

3. Defendant Leigland's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 76] is DENIED; and

4. Defendant Leigland's Motion to Suppress Statements, Admissions, and Answers [ECF No. 77] is DENIED.

Dated: January 15, 2020						BY THE COURT:

								s/Nancy E. Brasel
								Nancy E. Brasel
								United States District Judge